**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Alfred T. Giuliano as Liquidation Trustee for RIH Acquisitions NJ, LLC dba The Atlantic Club Casino Hotel and Rancho's Club Casino, Inc. d/b/a Magnolia House Casino, on behalf of itself and all others similarly situated,<br><br>     Plaintiffs,<br><br>   vs.<br><br>Scientific Games Corporation, a Nevada corporation, formerly a Delaware corporation;<br><br>Bally Technologies, Inc., d/b/a SHFL Entertainment or Shuffle Master, a Nevada corporation;<br><br>and<br><br>Bally Gaming, Inc., d/b/a Bally Technologies, f/k/a Bally Gaming and Systems, f/k/a SHFL Entertainment, Inc., f/k/a Shuffle Master, Inc., a Nevada corporation,<br><br>     Defendants. | Case No. 1:20-cv-05262<br><br>Judge: John F. Kness<br><br>**JURY TRIAL DEMANDED** |

**FIRST CONSOLIDATED AMENDED COMPLAINT**

Plaintiff Alfred T. Guiliano as Liquidation Trustee for RIH Acquisitions NJ, LLC dba The Atlantic Club Casino Hotel and Rancho's Club Casino, Inc. d/b/a Magnolia House Casino ("Plaintiffs"), by and through its undersigned attorneys, brings this proposed class action and alleges as follows.

1

**INTRODUCTION**

1.  This action arises out of the alleged monopolization of the market for automatic card shufflers used at casinos through Defendants' abuse of the patent system and judicial process to exclude and drive out competitors from the market. Specifically, Plaintiffs allege that Defendants Scientific Games Corporation ("SGC"), Bally Technologies, Inc. ("BTI") and Bally Gaming, Inc. ("BGI") (collectively "Bally"), which manufacture and sell fully automated card shufflers under the Shuffle Master, DeckMate, and Bally names, procured patents by fraud and then asserted those patents in sham lawsuits against competitors, which effectively excluded competitors from the market and caused Plaintiffs and others similarly situated to pay more for automated card shufflers than they otherwise would have in a competitive market.[1] Defendants' alleged misconduct constitutes a violation of Sections 2 and 3 of the Sherman Act (15 U.S.C. §§ 2, 3).

2.  Several of Defendants' would-be competitors—other manufacturers and distributors of automated card shufflers—have sued Defendants alleging similar facts about Defendants' effects to monopolize the market using fraudulently procured patents and sham litigation. In fact, in December of 2018, a Chicago jury rendered a verdict against Defendants for violations of Section 2 of the Sherman Act and awarded the competitor-plaintiffs $105 million in damages, which was then trebled for a total of $315 million. *See Shuffle Tech, et al. v. Scientific Games Corp.*, No. 15-cv-3702 (N.D. Ill.) ("*Shuffle Tech*"). In another competitor suit alleging violations of Section 2, the United States District Court for the Northern District of Illinois recently denied Defendants' motion to dismiss. *See TCS Inc., et al. v. Scientific Games Corp.*, No. 19-cv-1846, 2020 WL 1678258 (N.D. Ill. March 20, 2020). This lawsuit will be referred to herein as the

---

[1] SGC and Bally will be collectively referred to herein as "Defendants."

"*TCS* Litigation".

3.     As described further below, the market for automated card shufflers and related services is valued at approximately $100 million per year, and Defendants now control virtually 100% of that market as a result of their misconduct.

4.     Automated card shufflers play an important role in casinos and at card clubs. These machines are designed to produce reliably random shuffles to ensure fairness and increase game speed, profitability, and security. In many jurisdictions, shuffling by hand is illegal as well, making these machines a necessity. But the market is no longer competitive for these machines, allowing Defendants to set prices without fear of competitors undercutting them or stealing market share.

5.     Plaintiffs, direct purchasers of automated card shufflers, and others like it have suffered as a result of Defendants' monopolization and exclusion of competitors, forcing their direct customers—purchasers and lessees (collectively "direct purchasers")—to pay supracompetitive prices for automated card shufflers while Defendants collect monopoly rents.

## JURISDICTION

6.     This action arises under the antitrust laws of the United States, specifically Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) for violation of Sections 2 and 3 of the Sherman Act (15 U.S.C. §§ 2, 3). This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. §§ 4, 15 and 26; and 28 U.S.C. §§ 1331 and 1337.

7.     This Court has personal jurisdiction over Defendants in this state and district under 15 U.S.C. § 22; 28 U.S.C. §§ 1391(b), (c), and (d); Fed. R. Civ. P. 4(k)(1); the long-arm statutes of the State of Illinois; and the Due Process Clause of the United States Constitution, because the Defendants regularly conduct and transact business in this state and district, have a regular and established business in this district, are "found" in this district, "reside" in this jurisdiction, have agents in this state and district, and have well more than "minimum contacts"

with this state and district, all as further specified in the following paragraphs. Defendants have also committed acts violating the United States patent and antitrust laws in this state and district and have reaped the benefits of their unlawful activities in this district and the impact of those violations will be a substantial lessening of competition in the relevant market for card shufflers in this district. Moreover, Defendants' acts, both within and without of this district, have resulted in injury to each Plaintiff's business and property.

8.      Venue is proper in this judicial district under 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b)(1) and (2), (c)(2), and (d) because, *inter alia*, Defendants reside in this district, inhabit this district, are found in this district, have an agent in this district and transact business in this district and are subject to personal jurisdiction in this state and district, and a substantial part of the events giving rise to the claims asserted herein arose in this state and district, as further detailed in the following paragraphs. In addition, key witnesses, such as Messrs. Kimball Anderson ("Anderson") and Richard Schultz ("Schultz"), who reside in this district, would not be subject to the subpoena power of courts outside this district. Chicago is also more convenient for other key witnesses in the East and Midwest than other potential venues. Furthermore, key documents compiled and readily available in this district and subject to the subpoena power of this court may not be as easily obtained in other jurisdictions. Additionally, as a result of prior litigation in this court, the court is already familiar with many of the issues presented by this case. Defendants conduct business in this state and judicial district by, *inter alia*, distributing and/or selling card shufflers which are the subject of this action to casinos located in Joliet, Aurora, Elgin, and Des Plaines.

9.      Defendant SGC also has a Chicago campus at 350 North Orleans St., Chicago IL 60654 and has had a 483,000 square foot technology campus and administrative office in this judicial district at 2718 Roscoe St., Chicago, IL 60018. SGC has employed over 700 employees in Chicago and has had over 1,000 employees in Northern Illinois. Additionally, SGC has had a

long-term contract with the Illinois Gaming Board to design, implement, and administer a Central Communications System ("CCS") for Illinois that provides real-time communication and control between every licensed video gaming terminal in Illinois, as well as day-to-day management of the operation and servicing of the CCS throughout Illinois.

10.     On information and belief, Defendant BTI, under the direction of SGC, has sold card shufflers which have been manufactured by Defendant Bally Gaming, Inc. under the direction of SGC which are based on the patents at issue in this case (owned by BGI) to various casinos which are within the Northern District of Illinois and/or within the subpoena power of this court, *i.e.*, Hollywood Casino (Joliet); Harrah's Joliet Casino & Hotel (Joliet); Hollywood Casino (Aurora); Grand Victoria Casino (Elgin); and Rivers Casino (Des Plaines). Defendants also conduct business with the Ameristar Casino in East Chicago and the Horseshoe Casino in Hammond.

## PARTIES

11.     Plaintiff Alfred T. Giuliano as Liquidation Trustee for RIH Acquisitions NJ, LLC dba The Atlantic Club Casino Hotel, which was a New Jersey limited liability company founded in 2004. RIH Acquisitions NJ, LLC did business as the The Atlantic Club Casino Hotel, whose address was Boston On Pacific Avenue, Atlantic City, New Jersey 08401. The Atlantic Club Casino Hotel had over 75,000 square feet of casino gaming space, including a substantial space dedicated to table games. During the class period, The Atlantic Club Casino Hotel purchased and/or leased substantial quantities of card shufflers directly from one or more of the Defendants at supra-competitive prices and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct. Plaintiff is aware of his obligation to diligently represent the best interests of the class and is committed to doing so throughout the pendency of this litigation.

12.     Plaintiff Rancho's Club Casino, Inc. d/b/a Magnolia House Casino is a California corporation with its principal place of business located at 1275 Folsom Blvd., Rancho Cordova, CA 95670. During the class period, Magnolia House Casino purchased and/or leased substantial quantities of card shufflers directly from one or more of the Defendants at supra-competitive prices and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct. Plaintiff is aware of its obligation to diligently represent the best interests of the class and is committed to doing so throughout the pendency of this litigation.

13.     Defendant SGC is a corporation of the state of Nevada, formerly a corporation of Delaware, with a corporate office in Las Vegas, Nevada and an administrative and technology campus at 350 North Orleans St., Chicago IL, and was previously located at 2718 Roscoe St., Chicago, IL. SGC is a leading developer of technology-based products and services and associated content for the worldwide gaming, lottery, social and digital gaming industries. Its portfolio of revenue-generating activities primarily includes supplying gaming machines and game content, casino management systems, and table game products and services to licensed gaming entities; providing instant and draw-based lottery products, lottery systems and lottery content and services to lottery operators; providing social casino game solutions to retail consumers and regulated gaming entities, as applicable; and providing a comprehensive suite of digital real-money gaming and sports wagering solutions, distribution platforms, content, products and services.

14.     SGC does business in this judicial district by, *inter alia*, distributing and/or selling under the Shuffle Master and/or Bally name, card shufflers which are the subject of this action to casinos located in Joliet, Aurora, Elgin, and Des Plaines. SGC has also previously had administrative offices and manufacturing facilities that support SGC's gaming business in this judicial district at 800 S. Northpoint Road Blvd., Waukegan, IL. SGC controls and directs the

actions and operations of the other Defendants, including the authorization, maintenance and conduct of the sham litigation described herein, the conduct of the reexaminations described below, and the frauds perpetrated on the United States courts and the United States Patent and Trademark Office ("USPTO" or "PTO") and the courts and patent offices of other countries, notably South Africa, as further described below.

15.     Defendant BTI is a corporation of the State of Nevada, with offices at 6650 S. El Camino Road, Las Vegas, NV. On November 25, 2013, BTI acquired all of the stock of SHFL Entertainment, Inc. f/k/a Shuffle Master, Inc., which was merged into BTI on June 30, 2014. SHFL Entertainment, Inc. was concurrently or thereafter dissolved as a separate corporate entity, although Defendants failed to advise the court of this fact and to substitute the proper corporate entity in at least one of the sham litigations described herein.

16.     On November 21, 2014, SGC acquired Bally for $5.1 billion (including the refinancing of approximately $1.9 billion of existing Bally indebtedness). Bally's financial records and data were thereafter consolidated with SGC's on financial reports to the Securities and Exchange Commission ("SEC"). Bally's financial records and data have been consolidated for business purposes, and its revenues and funds have been commingled such that it is no longer possible, at least for the public, to separate or segregate Bally's and SGC's funds and revenues in any meaningful way.

17.     Subsequent to BTI's acquisition of SHFL Entertainment, Inc. (f/k/a/ Shuffle Master Inc.) on Nov. 25, 2013, Bally, and after November 21, 2014, SGC began using "Shuffle Master" or "SHFL" as trade names and have sold or leased card shufflers based on the patents at issue in this case under the "Shuffle Master" or SHFL name, including to casinos within the Eastern Division of the Northern District of Illinois, *i.e.*, Hollywood Casino (Joliet); Harrah's Joliet Casino & Hotel (Joliet); Hollywood Casino (Aurora); Grand Victoria Casino (Elgin); and Rivers Casino (Des Plaines). For these reasons and because Bally's automatic card shuffler

business has been consistently known throughout the gaming industry by its former names "Shuffle Master" and "SHFL Entertainment," this Complaint will sometimes refer to SGC and/or the Bally Defendants collectively as "SHFL".

18.     Defendant BGI is or was a corporation of the State of Nevada, with offices located at 6650 S. El Camino Road, Las Vegas, NV 89118. BGI is or was a subsidiary of Bally Gaming International, Inc., which operates, or was operated, as a subsidiary of Alliance Holding Co., which operates, or was operated, as a subsidiary of Defendant Bally. BGI operates, under the direction of SGC management, as a manufacturer of equipment and games, including under the Shuffle Master or SHFL name, for casinos in the United States, including all five casinos within the Northern District of Illinois (Eastern Division), *i.e.*, Hollywood Casino (Joliet), Harrah's Joliet Casino & Hotel (Joliet), Hollywood Casino (Aurora), Grand Victoria Casino (Elgin), and Rivers Casino (Des Plaines). According to assignment records in the USPTO, BGI is also the owner of record of the patents described herein.

19.     Since acquiring Bally on November 21, 2014, SGC has held itself out to the public as a single integrated entity, both financially and operationally. On Dec. 9, 2014, Bally filed with the SEC, a Form 15 providing notice of termination of its registration under section 12(g) of the Securities Exchange Act of 1934, essentially removing itself from the rolls of publicly traded entities, and began filing consolidated financial reports with the SEC, combining its financial data with that of SGC and its other wholly owned (or controlled) subsidiaries. As further documented by SGC's August 7, 2015 10-Q filing for the period ending June 30, 2015, all of Bally's and SHFL's financial data has been combined with SGC's. Separate financial statements have not been publicly available for Bally or SHFL as separate entities since that time.

20.     SGC's relationship with Bally far exceeds the normal scope of a parent/subsidiary

relationship. SGC manages and directs Bally's internal and external affairs and determines how Bally operates on a day-to-day basis. SGC's August 7, 2015 SEC form 10-Q filing with the SEC states that its operations are divided into three business segments - Gaming, Lottery, and Interactive—along product lines, rather than corporate lines. Each segment is managed by a separate executive who reports directly to the SGC Chief Executive Officer ("CEO") who is described as the "chief operating decision maker" on SGC's March 2015 Form 10-Q.

21.     To implement its corporate integration, SGC formed an "Integration Management Office" led by SGC's Chief Administrative Officer. By October 2015, SGC's website referred to "[t]he combined company" and that "[t]he combination of Scientific Games and Bally Technologies creates a premiere gaming and lottery entertainment and technology company . . . ."[2] By that date, no breakout information on Bally was available on either Bally's website or SGC's website (www.scientificgames.com). By October 2015, Bally was no longer a viable, operating entity, but a mere shell corporation through which SGC conducts its business. Subsequent to that date, Bally's operations, including those relevant to this case, were wholly directed by SGC and, to the extent Bally formally exists as a separate entity, it operates wholly as an agent of SGC.

22.     As described above and hereafter, (1) SCG's and Bally's funds have been commingled; (2) SGC is treating Bally's assets as its own; (3) Bally is governed and influenced by its alter ego, SGC, in particular, by the actions and directions of its chief executives and legal officers; (4) there is a unity of interest and ownership such that Bally and SGC are one and the same entity; and (5) adherence to the fiction that Shuffle Master, Bally, and SGC are separate entities would sanction a fraud on the Plaintiffs and the Court, promote injustice, and adversely affect the U.S. and worldwide markets for automatic card shufflers for casinos.

---

[2] https://www.prnewswire.com/news-releases/scientific-games-to-acquire-bally-technologies-in-transaction-valued-at-51-billion-269521831.html

## FACTUAL ALLEGATIONS

### A. The Relevant Market

23.     Since at least the early 20th century, casinos and card clubs have used machines to shuffle card-decks without human assistance and interference. These machines help reduce the labor associated with shuffling, as well as ensuring that there is more security and randomization associated with the shuffles.

24.     By the 1990s, electronic card shuffler machines were introduced, controlled by an onboard computer and fully-automated. In those shufflers, the computer determined the final "random" or other intended order for the final set of cards and the cards were mechanically sorted into that intended order.

25.     Automatic card shufflers can be used for virtually every card game on the casino floor, from public domain games such as blackjack and baccarat, to popular proprietary games such as Texas Hold 'Em, Caribbean Stud, Three Card Poker, Three Card Baccarat, and Pai Gow Poker.

26.     Casinos and card clubs, in particular, drive demand for these automatic card shufflers. The card shufflers assist the casino with minimizing labor and time spent on shuffling, reduce opportunity for cheating and collusion, and increase efficiency in the number of card games played, helping to bring in more guests and thus more revenue.

27.     For the purpose of this complaint, the "relevant market" is the market in the United States for automatic card shuffler machines certified and approved for use by casinos, excluding card shufflers designed for private consumer use in unregulated environments and also excluding electronic machines that randomize virtual "cards" in video-based games (hereafter, "automatic card shufflers").

28.     Upon information and belief, the market for these automated card shufflers and

related services is valued at approximately $100 million per year. SHFL's, Bally's, and SGC's annual revenues for these shufflers have exceeded $100,000,000 per year. Defendants have cumulatively earned over $1 billion in shuffler revenues through 2018.

29.     There are no reasonable substitutes for automatic card shufflers for casino table games that use physical playing cards. Without an automatic card shuffler, the dealer must shuffle by hand. Hand-shuffling is prohibited by gaming regulators in some jurisdictions. It is also more expensive and less secure by introducing human error and interference.

30.     The only other alternative to using automatic card shufflers is to use pre-shuffled cards, which can include either decks that are pre-shuffled in the backroom of a casino or pre-shuffled decks provided by the playing card manufacturer. But neither of these alternatives are considered an adequate substitute for automatic card shuffling machines. Pre-shuffled cards can only be used for one hand of cards, after which an additional pack of pre-shuffled cards needs to be used or the used cards need to be shuffled by hand or by machine. These purported alternatives are both time-consuming and expensive. Additionally, security suffers from pre-shuffling. There have been several instances of cheating based on pre-shuffled cards that were not in fact randomly shuffled. Cheating can result in multi-million dollar losses for affected casinos.

31.     Consequently, there are no reasonable substitutes or alternatives for automatic card shufflers for casino table games that use physical playing cards, meaning that demand is inelastic for these products. Inelastic demand means that increases in price result in limited declines in quantity sold in the market. In other words, because the demand for automatic card shufflers is inelastic, sellers of automatic card shufflers—like the Defendants—can raise the prices of these shufflers above competitive levels without seeing a decline in sales revenue. It also means that entities like Plaintiffs and others similarly situated have no alternatives to use as substitutes for these machines to be able to avoid any supracompetive prices charged by

Defendants.

32.     Any potential competitor also faces high barriers to entry to enter the relevant market. The United States casino industry is highly regulated by multiple gaming regulators, including by the state and/or Indian reservations where the casinos are located. Such regulations include licensing of the vendors to casinos, including vendors of gaming machines and ancillary equipment, as well as testing and licensing of the gaming equipment itself. In the case of card shufflers, such regulations include character and financial investigations of the potential vendors as well as rigorous testing of the shuffling equipment, including for randomness, by certain states, such as Nevada, as well as by testing companies such as Gaming Laboratories International ("GLI"). In addition to such regulation and testing, equipment such as shuffling machines must be field tested by the individual casinos or casino chains contemplating lease or purchase of machines. As a result of all these factors, entry into the relevant market is extremely expensive, time-consuming, and risky.

33.     Additionally, as described below, Defendants have erected other barriers to entry through their multitude of patents—which competitors have called a "patent thicket"— and which Defendants have historically used to keep out any and all would-be competitors, including through the use of patent fraud and sham litigation.

34.     Fringe firms also cannot easily enter the market or increase productions if Defendants increase prices for their automatic card shufflers because of the technology involved in creating these machines and the multitude of patents they need to navigate.

35.     Defendants have effectively achieved a 100% share in the relevant market and have achieved monopoly power in that market. Defendants' market share and monopoly power in the relevant market have not been achieved by virtue of superior acumen, innovation, skill, foresight, or industry, or by the proper functioning of the market, or by natural market conditions. Instead, such monopoly power has been achieved as the result of purposeful abuse of

the patent system and the judicial process by Bally and SGC and their predecessor entities. For more than a decade, Defendants have filed sham patent infringement lawsuits against every potential competitor that has marketed competitive card shufflers to casinos in the United States, leaving United States casinos and other direct purchasers with essentially no choice in automatic shufflers since at least 2009.

36.     According to SHFL's 2012 Annual Report (the last year that contained detailed shuffler sales and leasing information), as of the report date, SHFL had 8,285 SHFL shufflers on lease worldwide (primarily in the United States), with an average monthly lease of $451/unit, producing $44,838,420 in recurring revenue. That price has subsequently been increased by Defendants, after they successfully drove various competitors described below from the relevant market. According to SHFL, the majority of its leases are month-to-month and include shuffler service and support. Additionally, in 2012, SHFL sold 2,135 units at an average price of $15,843, for total sales of $33,824,805. Once again, that sale price was further increased after SHFL drove competitors from the market. SHFL's shuffler service revenue in 2012 was approximately $11,839,000 including monthly service fees for shufflers purchased and owned by casinos. SHFL's total utility segment revenue (excluding chipper sales) was $92,502,000 in 2012, comprised of almost $34,000,000 in one-time sales (subject to ongoing support revenue) and $59,000,000 in recurring revenue.

## B. Defendants' Sham Litigation

### 1. *CARD* Litigation

37.     In 2003, the manufacturer of another automatic card shuffler, Casinos Austria Research Development, GmbH. ("CARD") and its United States subsidiary, filed suit seeking declaratory judgment of non-infringement CARD's one2six shuffler of certain patents held by

SHFL.[3] SHFL counterclaimed several months later for infringement of those and additional

patents

38.     SHFL's counterclaim was the start of a pattern of litigation and threatening of

litigation to secure Defendants' dominance and monopoly. Former SHFL General Counsel Jerry

Smith ("Smith") declared in SHFL's lawsuit against then competitor CARD that: "… the mere

showing of the [CARD] one2six has the potential ability to disrupt Shuffle Master's order taking

and sales process. It could confuse customers into believing that there is an alternative to Shuffle

Master's shufflers available to them." *CARD* litigation, Decl. of Jerry Smith, ¶ 14, (Sept. 5,

2003). Then and now, Defendants' attitude was that no competition and no alternatives to its

shufflers would be permitted in the relevant market. In fact, SHFL successfully obtained a

preliminary injunction against CARD to prevent it from selling its automatic card shufflers in the

United States.

39.     CARD continued to pursue the litigation, however, and during discovery, a series

of information came to light undermining SHFL's patents and revealing its fraud on the USPTO.

Among other things, documents produced in discovery revealed that certain of SHFL's so-called

inventions were in fact developed by another: Halvard Solberg (a.k.a. "Hal Solberg") and his

company, Machine Design Associates, Inc. in 1996-98 for Casino Concepts, Inc.

40.     Specifically, CARD discovered that certain SHFL patents were based on Solberg's

"Roblejo Shuffler," which was publically exhibited and operated at the 1997 World Gaming

Congress and Expo in Las Vegas on October 14-16, 1997. The Roblejo Shuffler was

demonstrated at the show with transparent sides that enabled anybody that visited the booth the

see the internal workings of the shuffler. In addition to personally inspecting the Roblejo Shuffler

---

[3] A declaration of non-infringement refers to an application to the court for a declaration that a
new business does not infringe an existing patent.

at the expo, SHFL representatives also obtained a Roblejo Shuffler brochure that showed and described the operation of the Roblejo Shuffler. CARD thus discovered that SHFL knowingly incorporated what it had learned about the Roblejo shuffler into its patent application and wrote and amended claims to include features that they knew SHFL had not invented and were instead known to be present in the prior art Roblejo shuffler. Furthermore, CARD discovered that SHFL intentionally concealed the Roblejo shuffler (including all the material information in their possession relating thereto, as described herein) from the PTO, despite the fact that all of this information was required to be disclosed under applicable rules and laws.[44] Had that art not been concealed from the PTO, certain of SHFL's patents would not have issued. More facts about SHFL's illicit use and incorporation of technology from the Roblejo and related shufflers, as well as its illicit concealment of this prior art from its patent applications, are discussed in the following section.

41.     CARD's momentous discovery revelations did not stop SHFL, however, from continuing with the litigation and finding ways to punish its would-be competitor. At the time, CARD only had a few million dollars of sales, and the preliminary injunction prevented it from selling its core products in the United States. Thus, despite these significant discovery revelations, SHFL leveraged the situation to *acquire* CARD for $50,000,000, comprised of a cash payment and 767,076 shares of the company's common stock. This acquisition resulted in CARD exiting the market and SHFL avoiding the threat of competition. It also solidified SHFL's monopoly position in the market and ensured that its casino customers would have no "alternative to Shuffle Master's shufflers available to them," thus achieving the goal set forth in

---

[4] USPTO guidelines specifically state that information material to patentability may include information learned from "co-workers, trade shows, communications from or with competitors, potential infringers, or other third parties." MANUAL OF PATENT EXAMINING PROCEDURE § 2001.06 (8th ed., Aug. 2001).

the September 2003 declaration of Smith.

42.    SHFL in fact bragged about its sue-and-acquire strategy to the press. In a news article published in IBD on November 15, 2004, several months after SHFL acquired former competitor CARD and its competing One2Six card shuffler, SHFL's former CEO, Mark Yoseloff, explained how he forced the distress sale of CARD, a company with a "terrific product" that he desired: "[s]o we had to create a situation where they would be induced to sell," Yoseloff said. "It struck me that one way (to do that) was to sue them (and have them incur) legal fees sufficiently high even for a company the size of the parent." This was one of the first cases of Defendants' using sham litigation to secure and enforce their monopoly.

    2. *VendingData* Litigation

43.    Less than six months after the *CARD* litigation was finalized, on October 5, 2004, SHFL filed suit against its next target, VendingData. SHFL filed this suit one day after VendingData announced the availability of its PokerOne automatic card shuffler. SHFL accused VendingData of allegedly infringing a child patent in the same Patent Family that CARD had previously demonstrated had been obtained through fraud on the PTO.

44.    Initially, a preliminary injunction issued against VendingData, but during discovery, it was again learned that SHFL withheld the the Roblejo shuffler and other prior art (described below) from the PTO. VendingData eventually won its case on summary judgment of non-infringement, which ended the case in February 2008 after years of litigation. In the meantime, however, VendingData was forced out of business by early 2006 due to the overwhelming expense of the patent litigation and the impact of the preliminary injunction.

45.    During the litigation, the aforementioned Anderson of the law firm of Winston & Strawn defended VendingData against SHFL. In representing VendingData, Anderson also concluded that, in addition to the patent misconduct, SHFL was engaging in illegal anticompetitive conduct including "patent abuse and other violations of the antitrust laws" and

16

expressed to SHFL that he was considering filing an antitrust case against it. VendingData could not afford to pursue the antitrust case against SHFL, but to eliminate antitrust threats from Anderson, SHFL approached and hired him and Winston & Strawn to represent SHFL in future patent litigations thereby precluding the possibility that he or his firm could bring an antitrust case against SHFL.

46. SHFL's misconduct only helped to further secure and strengthen its monopoly. In addition to Vending Data's exist from the market, VendingData and its successor, Elixir Gaming Technologies, Inc. thereafter sold its shuffler business and its shuffler patents to SHFL for approximately $2.4 million and a seven year worldwide non-compete agreement, thereby eliminating VendingData and its products from the shuffler market. The VendingData sham litigation thereby ultimately solidified SHFL's monopoly over the relevant shuffler market.

47. Defendants first achieved complete monopolization of the relevant market on or around March 16, 2009, when SHFL, after suing and acquiring CARD, acquired the shuffler assets and patents of its only remaining competitor, VendingData.

3. The *Taiwan Fulgent* Sham Litigation

48. Defendants maintained their monopoly by suing other would-be competitors, alleging that such competitors infringed on their patents.

49. Indeed, in November 2009, SHFL sued Taiwan Fulgent Enterprise Co., Ltd. ("Taiwan Fulgent"). Taiwan Fulgent is a Taiwanese company that manufactured the "A Plus" series automatic card shufflers and has been producing innovative automated products for the gaming industry for over 30 years.

50. Taiwan Fulgent's A Plus shufflers were significantly competitive products to SHFL's automatic card shufflers. Among other things, the A Plus shufflers were advertised as increasing game speed and profitability as well as security by producing a non-traceable random

17

shuffle that ensures fairness of the card games. The effectiveness of Taiwan Fulgent's A Plus shufflers in producing a reliably random shuffle was certified by Gaming Laboratories International ("GLI"), an independent testing agency recognized by gaming regulators in most gaming jurisdictions around the world, as well as successfully passing the BMM Random Test. Additionally, the A Plus shuffler was and remains less expensive than the shufflers offered by Defendants and therefore constituted a substantial threat to the monopoly that Defendants established in the casino market for fully automated card shufflers. SHFL's lawsuit against Taiwan Fulgent alleged infringement of several patents, including the patent that was shown in the CARD litigation to be invalid over the Roblejo shuffler and obtained by fraud on the USPTO.

51.     Faced with the overwhelming expense of patent litigation, and having no knowledge of the fraud perpetrated against it and the USPTO, Taiwan Fulgent elected to withdraw from the United States market and the case quickly settled in February 2010. The settlement required Taiwan Fulgent to stay out of the United States Shuffler market for 3 years and to make clear to any potential customer that saw the A Plus shuffler that it was not available to the United States market, thereby further solidifying SHFL's monopoly over the relevant shuffler market.

### 4. *TCS* Sham Litigation

52.     In September 2012, SHFL sued also TCS America, the United States sub-distributor for Taiwan Fulgent's A Plus shuffler. The suit was based solely on the registration to show the A Plus shuffler at the 2012 G2E show in Las Vegas. The suit alleged infringement of several patents, including the same patent that had been shown to be invalid and obtained by fraud on the PTO in the *CARD* litigation. Anderson, as SHFL counsel, also threatened to also sue TCS for infringing another patent if TCS continued to offer the A Plus shuffler in the United

States.

53.     To put additional pressure on TCS, Defendants also sued TCS for patent infringement in South Africa in August of 2012 based on a foreign counterpart of a patent asserted in the United States litigation against TCS. According to TCS, Anderson "overtly used the existence of the South Africa litigation as part of Defendants' strategy to intimidate TCS into not competing in the U.S. market with the A Plus shuffler."

54.     Although Anderson and SHFL were aware of the foregoing sham litigations and rulings against them, unfortunately, TCS's South Africa counsel was not. The South African court and TCS's counsel also relied on the supposed expert testimony of a Mr. Attila Grauzer, who turned out to hold a position as the Vice President of Engineering, Utility Products at SHFL, Bally, and SGC during the South Africa litigation, in concluding that the asserted patents were valid and infringed by TCS. As a result of Defendants' fraud on the South Africa court and TCS, the court entered a judgment and injunction against TCS, destroying TCS's shuffler business in South Africa and further intimidating and hindering the TCS Plaintiffs from entering the United States market with the A Plus shuffler.

55.     Faced with the expense of patent litigation in both the U.S. and South Africa, and still having no knowledge of the on-going fraud SHFL perpetrated on the PTO and the courts, TCS settled Defendants' United States case in January 2013 by effectively withdrawing from the United States market. TCS's exit only further solidified Defendants' monopoly over the relevant shuffler market.

    5. The *DigiDeal* Sham Litigation

56.     Within a month of filing the *TCS* litigation, in October of 2012, SHFL filed the patent infringement case against DigiDeal Corporation ("DigiDeal"), the manufacturer of another competing shuffler known as the DigiShuffle. DigiDeal, a Spokane gaming equipment

manufacturer, had a patent and technology license agreement with a Chicago company, Shuffle

Tech International LLC ("Shuffle Tech"), which was the original manufacturer of the

DigiShuffle.

57.    DigiDeal displayed its DigiShuffle card shuffler for the first time at the 2012

G2E show in Las Vegas on October 2-4, 2012. The proposed retail price for the DigiShuffle was

$10,995, which was very similar to the retail price of the A Plus shuffler and far less than comparable shufflers sold by Defendants. The proposed monthly lease price of the DigiShuffle for casinos was $350/month. DigiShuffle's sale and lease prices were far less than the SHFL DeckMate or DeckMate2, which respectively sold for $16,995 and $20,995, or leased for $450/month or $525/month, respectively. DigiShuffle's lower cost and simplicity of design was met with a positive market response and demand was considerable from the start. But, as in the case of the A Plus shuffler, SHFL again recognized the threat of a competitor's improved technology and lower prices and immediately sought to evict the competition through sham litigation.

58. Once again, Anderson represented Defendants, including with the pre-filing investigation, which would have of course revealed that Defendants had concealed the extensive information they possessed on the Roblejo and related shufflers, and that the concealed prior art clearly anticipated the patent claims asserted against DigiDeal. Nonetheless, SHFL pursued the litigation again DigiDeal.

59. DigiDeal served document requests, which should have revealed the the information about SHFL's appropriation of technology from Roblejo shuffler found at the 1997 Expo and the extensive prior art information on the shufflers related to the Roblejo shuffler. But instead of properly producing the invalidating prior art information, Defendants improperly objected to the request as being, among other things, unduly burdensome. This is despite the fact that Jennifer Farrar, Defendants' in-house patent attorney since December 1996 who worked closely with SHFL's general counsel, Jerry Smith, kept this information in a file in her office from the 1997 Expo and had multiple copies of responsive information that she routinely used in filings with the PTO. By improperly concealing the prior art in discovery, Defendants prevented

DigiDeal from effectively defending itself in the litigation, just as SHFL had done in the CARD litigation.

60. In the meantime, DigiDeal had initiated reexaminations on certain patents but because Defendants concealed the invalidating information, for example, the Roblejo Shuffler brochure published at the 1997 Expo, DigiDeal was unable to use any of that prior art to in the reexaminations. Meanwhile, Defendants' infringement case against DigiDeal was stayed during the reexamination of those patents, and at Defendants' insistence, the stay required DigiDeal to cease selling its DigiShuffle shuffler and to recall the shufflers it had already placed in the market, thereby destroying its business.

61. During the DigiDeal litigation, Shuffle Tech's CEO, the aforementioned Schultz, conducted an in-depth investigation into the history of SHFL's patents and the prior art and discovered that the disks SHFL filed in certain patent applications had been mislabeled; Schultz ordered the disks from the PTO and, in late 2014, after reviewing the disks, realized SHFL had been hiding prior art from the PTO, and therefore, had been engaging in sham litigation against its competitors for years.

62. Although the reexaminations were still pending, armed with this new information, on April 28, 2015, Shuffle Tech and the distributor and marketer of DigiShuffle, Aces Up Gaming, Inc. and Poydras-Talrick Holdings LLC, filed suit against Defendants alleging that their patents were invalid and that they nevertheless knowingly attempted to enforce them in violation of Section 2 of the Sherman Act, the Lanham Act, and Illinois Law. The Complaint pointed out that Defendants had withheld the invalidating prior art shufflers and that Defendants and their attorneys were continuing to conceal the Roblejo shufflers and other related shufflers in pending reexaminations.

63.     The *Shuffle Tech* case eventually went to trial, where the plaintiffs put on evidence about Defendants' anticompetitive conduct and how they lost business as a result. They also presented evidence about how their competing shuffler, the DigiShuffle, was more reliable, cost less to build, and sold for half the price of Defendants' shuffler. The jury found that Defendants' had illegally monopolized the relevant shuffle market by using sham litigation predicated on invalid patents obtained by fraud. The jury awarded $105 million in compensatory damages (automatically trebled to $315 million by the court). Judgment entered in that case on August 7, 2018 and the case thereafter settled on December 24, 2018.

64.     Even with Shuffle Tech's victory over Defendants, the litigation battle was still ultimately a success for Defendants and maintaining their control and monopoly power over the automatic card shuffler market. As Shultz said in reflecting on the litigation, "[b]eing a small company, we had the ability to develop a great product, but we didn't have the ability to compete with a large corporation with those type of resources and defend ourselves against a sham lawsuit."[5] Today, Shuffle Tech only makes card shufflers for the consumer market. Shultz explained that Shuffle Tech was "basically put out of the gaming industry" as a result of the litigation.[6] With the litigation battle causing Shuffle Tech's effective exit from the automatic card shuffler market, Defendants' have only solidified their monopoly power over this market.

6. Summary of Defendants' Sham Litigation

65.     As reflected in the allegations above, Defendants engaged in a pattern of suing would-be competitors to enforce patents that Defendant knew would not have issued had they not concealed the prior art from the USPTO. In other words, Defendants sought to enforce patents that they knew were invalid and unenforceable – and continued to pursue litigation against other

---

[5] https://www.casino.org/news/scientific-games-loses-antitrust-case-owes-competitors-315-million/.
[6] *Id.*

competitors even after the multiple rulings against them. No reasonable litigant could reasonably expect success on the merits of these lawsuits, but Defendants pursued them nevertheless because the threat of litigation and all the difficulties that come with litigation could be used to put pressure on competitors to sell their businesses to Defendants or to force them to exit the market and stop selling competitive shufflers. Defendants intentionally used these lawsuits to directly interfere with their competitors' businesses and to grow and enforce Defendants' monopoly over the automatic card shuffler market.

66.     Now, in addition to the *Shuffle Tech* antitrust litigation, Taiwan Fulgent and TCS have sued Defendants for monopolization in violation of Section 2 of the Sherman Act. As noted above, on March 20, 2020, the United States District Court for the Northern District of Illinois denied Defendants' motion to dismiss. As described below, the ruling on the Motion to Dismiss is the *TCS* Litigation was the first time Plaintiffs discovered Defendants' unlawful acts and Plaintiffs' potential claim.

### C.  Defendants' Fraud on the USPTO

67.     As referenced above, Defendants have also abused the patent system by using fraud to obtain otherwise invalid patents. Specifically, Defendants obtained patents through knowing and willful fraud on the USPTO and then also maintained and enforced those patents although they knew the patents were invalid and unenforceable.

68.     Defendants defrauded the PTO by intentionally omitting material references from the prosecution of several patents as well as the reexamination of those patents. Defendants' patents at issue include, but at not limited to: (a) U.S. patent 6,149,154 on November 21, 2000; the '154 patent was asserted by SHFL against CARD; (b) U.S. patent 6,588,750; the '750 patent

was also asserted against CARD; and (c) U.S. patent 6,655,684; the '684 patent was asserted

against VendingData; (d) U.S. patent 7,073,791, asserted against TCS; (e) U.S. patent 7,059,602,

asserted against TCS; (f) U.S. patent 8,210,535; SHFL threatened TCS with an infringement suit

based on the '535 patent; (g) U.S. patent 6,254,096, asserted against TCS; (h) U.S patent

6,588,751, asserted against CARD and then subsequently against both Taiwan Fulgent and TCS;

the '751 patent was also later involved in reexamination proceedings based upon a request by

Taiwan Fulgent; (i) U.S. Patent Nos. 7,255,344 and 7,322,576, were also asserted against Taiwan

Fulgent; (j) U.S. patent 6,651,982, asserted against DigiDeal and subject to reexamination

proceedings; (k) U.S. patent 7,523,935, also asserted against DigiDeal and subjected to

reexamination proceedings; (l) U.S. patent 6,068,258, asserted against VendingData, and (m)

U.S. patent 6,325,373 asserted against VendingData; U.S. patent 6,139,014, asserted against

CARD.

69.     The material references that Defendants and their predecessors omitted in their

patent prosecutions and reexaminations are the existence of prior automatic shufflers:

specifically, the Nicoletti shuffler (also referred to as the "1st Roblejo Prototype" or "Roblejo

1"), the Roblejo shuffler, and the Luciano shuffler.

70.     The Nicoletti shuffler was developed by Adolf Nicoletti in 1985 to 1989 and was

built by Precision Automation, Inc. as an an automatic card shuffling machine for use with a card

gaming table, such as a blackjack table in a casino. The Nicoletti Shuffler can be flush-mounted

into a gaming table and has a card receiver for receiving a stack of unshuffled cards, a shuffling

wheel with 16 individual compartments each designed to hold multiple cards, a first card mover

that moves cards individually from the card receiver to the compartments, a second card mover

that moves cards from the compartments to a second card receiver upon demand, and a processor

programed to control the first and second card mover in order to randomly assign each card in the stack to a compartment and then output the cards from the compartments to provide a shuffle deck of cards. Each compartment in the wheel includes a wall with a beveled surface that helps prevent jamming of the cards when they are being inserted into the compartments by providing a deflecting surface that is contacted by the cards and alters the angle of the cards when entering the compartments. The Nicoletti shuffler also included sensors and software that counted and kept track of the number of cards in each compartment of the wheel at any given time.

71.     The Nicoletti shuffler was publicly demonstrated at a Bally casino—specifically, Bally's Park Place Casino in Atlantic City, New Jersey—for approximately one week, starting on March 12, 1990. Various newspapers published stories about the Nicoletti shuffler that explained the structure and operation thereof and the details of the public demonstration at Bally's Park Place. The Nicoletti shuffler was sold by Mr. Nicoletti's company, We Are 21, Inc., to Casino Concepts around 1996.

72.     The Roblejo shuffler (also referred to as the "2nd Roblejo Prototype" or "Roblejo 2" or "Sure Shuffler") is a second generation of the Nicoletti shuffler, also for use with a card gaming table, developed around 1996. The internal structure and operation of the Roblejo shuffler was based on the earlier Nicoletti shuffler, but, unlike the Nicoletti shuffler, the Roblejo shuffler is designed to sit next to and be operated at the side of a gaming table. Like the Nicolleti shuffler, the Roblejo shuffler also included a card receiver for receiving a stack of unshuffled cards, a shuffling wheel having 16 individual compartments each designed to hold multiple cards, a first card mover that moves cards individually from the card receiver to the compartments, a second card mover that moves cards from the compartments to a second card receiver upon demand, and a processor programed to control the first and second card mover in

order to randomly assign each card in the stack to a compartment and then output the cards from the compartments to provide a shuffled deck of cards. Each compartment in the wheel includes a wall with a beveled surface that helps prevent jamming of the cards when they are being inserted into the compartments by providing a deflecting surface that is contacted by the cards and alters the angle of the cards when entering the compartments. The Robejo shuffler also included sensors and software that counted and kept track of the number of cards in each compartment of the wheel at any given time.

73.     U.S. patent 5,989,122 (the "Roblejo '122 patent") is directed to and discloses an automatic card shuffler for table games. The Roblejo '122 patent issued on November 3, 1999, based on a patent application that was filed on January 3, 1997. The Roblejo '122 patent generally, but not completely, discloses various feature of the Roblejo shuffler, including the card receiver, first and second card movers, and the shuffling wheel with numerous compartments designed to hold multiple cards in each compartment, wherein each compartment includes a wall with a beveled surface that helps prevent jamming of the cards when they are being inserted into the compartments by providing a deflecting surface that is contacted by the cards and alters the angle of the cards when entering the compartments. These features are shown even more clearly in the Roblejo shuffler itself. The Roblejo patent does not disclose the feature of counting and keeping track of the number of cards in each compartment of the wheel at any given time.

74.     The Roblejo Shuffler was publically exhibited and operated at the 1997 World Gaming Congress and Expo in Las Vegas on October 14-16, 1997.

75.     At the 1997 Expo, SHFL representatives (including at least SHFL's lead engineer of shuffler development, Attila Grauzer ("Grauzer"), and its in-house patent attorney, Jennifer

Farrar ("Farrar")) personally inspected the Roblejo shuffler and saw that its wheel had compartments designed to hold multiple cards and included the beveled surface. Indeed, the Roblejo Shuffler was demonstrated at the show with transparent sides that enabled anybody that visited the booth the see the internal workings of the shuffler, including the shuffling wheel with 16 slots that were each designed to hold multiple cards per slot during shuffling, and the elements that moved the cards into and out of the slots in the wheel. SHFL representatives thus gained first-hand knowledge of the Roblejo shuffler's structure, features and operation.

76.     Moreover, at least Farrar and Grauzer also obtained a Roblejo shuffler brochure at the 1997 Expo, which shows and describes the operation of the Roblejo shuffler. Farrar, Grauzer and other SHFL representatives also met and obtained business cards from Conrad Roblejo and Stephen Gola (executives of Casino Concepts) during their visit to the Casino Concepts booth and inspection of the Roblejo shuffler at the 1997 Expo. Both Farrar and Grauzer (and others at SHFL) were also well aware that the Roblejo Shuffler brochure had been distributed to the public by at least October 1997, thereby constituting a prior art printed publication.

77.     Farrar and Grauzer also both maintained copies of the Roblejo shuffler brochure and 1997 Report on Shuffler Competition in their personal files since 1997, which confirmed their inspection and their knowledge of the structure and operation of the Roblejo shuffler. Farrar also maintained in her department a formal collection of printed information and materials (including prior art brochures and other prior art information) on prior art shufflers, including on the Roblejo Shuffler, obtained from trade shows and the like, including the 1997 Expo.

78.     The other relevant prior art relates to the Luciano shuffler, an automatic card shuffling machine for use with a card gaming table, such as a blackjack table in a casino. The Luciano shuffler was developed by Lawrence (Larry) Luciano and his company, Luciano

Packaging Company, in 1992-1993. The shuffler was initially developed under contract for International Gaming Technology, Inc. (IGT) but later marketed directly by Luciano Packaging Company starting in 1993 after the IGT contract was canceled.

79.     The Luciano shuffler is designed to be flush-mounted into a gaming table so that only the card input and output areas are visible on the table. The shuffler includes, inter alia, a first card receiver for receiving a stack of cards to be shuffled, a first card mover for moving cards into a shuffling wheel having a compartment for each card to be shuffled, and a second card mover for moving cards out of the wheel into a second card receiver. The wheel is controlled by a microprocessor that rotates the wheel to a random slot to deliver a random card that is output from the wheel, using an elevator arm with rollers, to a dealing shoe located above the surface of the table. The microprocessor uses input from sensors to count and keep track of the number of and identity of cards in the shuffling wheel at any given time during shuffling. Sensors and processing are also provided to sense when a predetermined number of cards are not present in an output area of the shuffler and, in response, to deliver additional cards to meet the minimum number desired.

80.     A marketing video of the Luciano shuffler was made in 1993 in order to show the structure and operation thereof. The marketing video was distributed to numerous gaming companies in 1993 and 1994, including SHFL, in order to market the Luciano shuffler the relevant public.

81.     Farrar and Grauzer knowingly incorporated what SHFL had learned about the aforementioned shufflers into SHFL's patents and concealed this prior art from the USPTO. As reflected in the following examples, had Defendants not concealed this information from the USPTO, and had its examiners known of the prior art, Defendants' aforementioned patents

would not have issued. Similarly, no reasonable person would have attempted to enforce these patents, which upon any reasonable investigation, would have been determined to be invalid and unenforceable.

82.     For example, in the '096 patent application, Farrar and Grauzer claimed features that they knew SHFL had not invented and were instead known to be present in the prior art, the Roblejo Shuffler. There was also no excuse for SHFL to have withheld the critical information it had learned at the 1997 Expo relating to the Roblejo Shuffler, including the fact that the wheel, disclosed and seen by SHFL (including at least Grauzer, Farrar and other SHFL representatives) at the 1997 Expo, had compartments designed to hold multiple cards and included the beveled surface as claimed. All of this information was required to be disclosed under applicable rules and laws. The '096 patent would not have issued had the prior art not been intentionally concealed from the Examiner by SHFL and its representatives.

83.     Likewise, SHFL (including Farrar and Grauzer) intentionally concealed the Roblejo Shuffler order to obtain allowance of the '751 claims. Defendants knew about the Roblejo shuffler and were also well aware of the Roblejo '122 patent, having disclosed it in January 2001 in the '750 pending application. Although the '750 patent family and the '751 patent family had almost identical patent specifications, directed to substantially the same subject matter, by concealing the Roblejo patent in the '751 application, SHFL was able to obtain claims that were much broader than it otherwise would have obtained had the Roblejo patent been disclosed. However, SHFL, as well as Frarrer and Grauzer (and the other named inventors), all of whom were substantively involved with the prosecution, intentionally concealed the Roblejo '122 patent and the Roblejo Shuffler (including all the material information in their possession relating thereto) from the PTO, despite the requirement that this information be disclosed under

applicable rules and laws. The '751 patent would not have issued had the prior art not been intentionally concealed from the Examiner by SHFL and its representatives.

84.     SHFL and its attorneys also committed fraud on the PTO in order to obtain allowance of the '154 patent asserted against CARD. At least Farrar and Grauzer (as well as the other named inventors) and SHFL, all of which were substantively involved with the prosecution and had a duty of disclosure to the PTO during the prosecution of the '154 patent, were well aware of material prior art, including the Roblejo shuffler, but intentionally concealed that information from the PTO. The '154 patent would not have issued had the art not been concealed from the Examiner. Instead of disclosing critical information they learned about the Roblejo shuffler at the 1997 Expo, at least Farrar and Grauzer knowingly incorporated what SHFL had learned about the Roblejo shuffler into its '154 patent application and wrote and/or amended claims to include features that they knew SHFL had not invented and were instead known to be present in the prior art Roblejo shuffler.

85.     SHFL also fraudulently omitted the Nicoletti, Luciano, and Roblejo references during the prosecution of the '935 patent, which lasted from October 2003 until April 2009. At least Farrar and Litman intentionally concealed what they had learned about the Roblejo shuffler at the 1997 Expo and the extensive information they possessed relating to the prior art Nicoletti, Roblejo and Luciano Shufflers. Indeed, after the *CARD* litigation, SHFL prepared multiple discs containing all the documents from the case discussing these references as well as information regarding their operation. Farrar also discussed these disks with Defendants' outside patent counsel. Thus, it is clear that Defendants undoubtedly knew about this prior art but pursued the '935 without concealing this information to the PTO. The concealed prior art clearly anticipates claims of the '935 patents, as demonstrated in the *Shuffle Tech* case.

86. A final example of Defendants' fraud in the procurement of certain of its patents is with respect to the '982 patent application, which was also addressed in the *Shuffle Tech* case. Specifically, Defendants withheld information about U.S. patent 6,361,044 to Block ("the Block '044 patent"), issued by the PTO in March 2002, which discloses an automatic card shuffling and dealing system that includes a shuffling device under the gaming table and an elevator that delivers the shuffled cards to the table surface. SHFL disclosed this patent in the specifications of four patent applications it submitted in July 2003 as well as during the course of the prosecution of the '935 patent. The company did not disclose the Block '044 patent in the application for the '982 patent however.

## Tolling

87. Plaintiffs were unaware it had suffered antitrust injury until March 20, 2020, when the Court issued the Order on the motion to dismiss in the *TCS* Litigation. At that time, Plaintiffs discovered through conversations with its attorneys, that Defendants had not established their control and dominance in the automatic card shuffler market through their business acumen or the quality of their products, but instead that they had engaged in significant anticompetitive behaviors to procure fraudulently obtained patents and then enforced those patents and engage in litigation to force competitors to exit the market. It was only at that point that Plaintiffs discovered that Defendants had achieved not only market power as product of superior skill, foresight, or industry, but in fact maintained monopoly power through their use of anticompetitive and illicit behavior designed to exclude and punish would-be competitors. As a result, Plaintiffs could not have pleaded the elements of their antitrust claims prior to March 20, 2020.

88.     Additionally, Defendants have continuously concealed their illicit acts, as discussed above, including concealing knowledge of prior art from the USPTO, concealing discovery about such prior art in other litigations, and omitting and concealing the results of other litigations in subsequent lawsuits against other competitors.

89.     Defendants continue to deny culpability in an effort to conceal their unlawful conduct. In court filings in the *Shuffle Tech* litigation, for example, they argued that they did not intend to mislead the patent office and that their lawsuits against competitors like Shuffle Tech were not frivolous. Even following the jury verdict in the *Shuffle Tech* litigation, a Scientific Games spokeswoman Susan Cartwright in a statement that "[t]he company believes the jury reached the wrong result and will seek review of both the finding of liability and the damages award both before the trial court and if necessary on appeal."[7] The parties in *Shuffle Tech* ended up settling, with no admission of liability, despite the jury verdict against Defendants.

## CLASS ACTION ALLEGATIONS

90.     Plaintiffs bring this action on its own behalf and as a class action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class (the "Class"):

> All persons and entities that directly purchased or leased automatic card shufflers within the United States, its territories and the District of Columbia from any Defendant or any predecessor, subsidiary or affiliate thereof, at any time between April 1, 2009 and the present. Excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, Defendants' officers, directors, employees, and immediate families, and any judicial officers or their staff working on this action.

91.     The Class Period is defined as April 1, 2009 until present.

92.     Plaintiffs do not know the exact number of members of the Class because such

---

[7] https://www.reuters.com/article/us-scientific-games-shuffle-verdict/us-jury-orders-scientific-games-to-pay-315-million-in-antitrust-case-idUSKBN1KS2HF

information is in the exclusive control of Defendants. Due to the nature of the trade and commerce involved, however, Plaintiffs believe that Class members number at least in the thousands and are sufficiently numerous and geographically dispersed throughout the United States, its territories and the District of Columbia so that joinder of all Class members is impracticable.

93. There are questions of law and fact which are common to the claims of Plaintiffs and the Class, including, but not limited to:

a. Whether Defendants possessed monopoly power in the market for automatic card shufflers in United States during the Class Period;

b. Whether Defendants willfully acquired or maintained monopoly power in the market for automatic card shufflers in the United States during the Class Period;

c. Whether Defendants attempted to maintain monopoly power in the in the market for automatic card shufflers in the United States during the Class Period;

d. Whether Defendants used fraudulent obtained patents and/or sham lawsuits against competitors enforcing those patents for the purpose of acquiring and/or maintaining monopoly power.

e. Whether Defendants violated Sections 2 and 3 of the Sherman Act (15 U.S.C. §§ 2, 3) as alleged in Plaintiffs' First Claim for Relief;

f. Whether Defendants' agents, officers, employees, or representatives were acting within the scope of their authority and in furtherance of Defendants' business interests;

g. Whether, and to what extent, the conduct of Defendants caused injury to Plaintiffs and members of the Class, and, if so, the appropriate measure of damages and/or other relief.

94.     Plaintiffs are members of the proposed class defined above, and Plaintiffs' claims are typical of the claims of the members of the Class.

95.     Plaintiffs will fairly and adequately assert and protect the interests of the Class.

96.     Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Class.

97.     Plaintiffs are represented by counsel competent and experience in the prosecution of antitrust and class action litigation.

98.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

99.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

    a.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

    b.   The Class is readily definable and one for which records should exist in the files of Defendants.

    c.   Prosecution as a class action will eliminate the possibility of repetitious litigation.

    d.   Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

    e.   Class treatment will permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this complaint on an individual basis.

f.   This class action presents no difficulties of management that would preclude its

maintenance as a class action.

## FIRST CLAIM FOR RELIEF

**Monopolization in Violation of Sections 2 and 3 of the Sherman Act**

100.   Plaintiffs repeat the allegations set forth above as if fully set forth herein.

101.   Defendants' conduct, as alleged herein, constitutes unlawful monopolization of the market for automatic card shufflers certified and approved for use by casinos in violation of Sections 2 and 3 of the Sherman Act (15 U.S.C. §§ 2, 3).

102.   "Market power" is the ability profitably to maintain prices above, or output below, competitive levels for a significant period of time. "Monopoly power" is the ability to control prices and exclude competition in a given market. If a firm can profitably raise prices without causing competing firms to expand output and drive down prices, that firm has monopoly power. Defendants maintain monopoly power in the market for automatic card shufflers sold in the United States during the relevant period.

103.   Defendants and their predecessor entities have maintained high and durable market shares in this market.

104.   As described herein, Defendants willfully acquired and maintained their monopoly over the relevant market by committing fraud on the USPTO to procure patents and by enforcing those invalid and unenforceable patents against would-be competitors in sham litigations. Defendants' assertion of knowingly invalid, unenforceable and non-infringed claims was for the purpose, and with the effect of, substantially lessening competition and attempting to create, and creating, a substantial restraint on trade and an actual monopoly in the relevant market described above.

105.   Prior to its sham litigation and resultant acquisition of CARD in 2004 and the

shuffler assets and data of VendingData in 2009, Defendants already had near dominant market share and market power in the relevant market, which market share and market power have been unlawfully maintained by SGC. Then, by falsely suing and subsequently acquiring CARD and VendingData, Defendants' market share of the relevant United States market increased to virtually 100% after March of 2009, and the resultant market power further increased Defendants' ability to raise prices, restrain and exclude competition, and preclude new entrants from the relevant market. That unlawfully obtained market power continues today under SGC's direction.

106.    Defendants' sham litigations against Taiwan Fulgent, TCS Huxley, and DigiDeal were also part and parcel of their sham patent infringement litigation strategy. Those sham litigations and the subsequent departures of those entities from the U.S. market further reduced competition and enhanced Defendants' monopoly power in the relevant market. Defendants' lawsuits were predicated on objectively baseless patent infringement claims which were motivated by Defendants' desire to impose collateral, anti-competitive injury on Defendants' competitors, potential competitors, their customers, and the market itself.

107.    SGC is directly liable for the acts of its own officers, directors, and attorneys in authorizing and maintaining the sham DigiDeal litigation after the date it acquired SHFL (Nov. 21, 2014), and is vicariously liable for the prior acts of SHFL and Bally's officers, directors, and attorneys.

108.    SGC, through many of the same officers and attorneys, ratified and approved those actions by authorizing and continuing the sham litigation despite SGC's full knowledge of the ongoing fraud on the USPTO and the ongoing sham litigation and the continuing monopolization of the relevant market. At least the following SGC officers: Gavin Isaacs, Kathryn Lever, and Derik Mooberry (who were top SHFL executives), had full knowledge of the

37

ongoing fraud on the USPTO and the wrongful nature of the DigiDeal sham litigation and ongoing monopolization of the shuffler market from the date they became SGC officers, and especially after service of the Complaint in this action on SGC (May 1, 2015), which specifically detailed those violations of which Isaacs, Lever, and Mooberry were either specifically or generally aware and could have easily investigated and confirmed including through counsel.

109.    SGC has also completely absorbed SHFL/Bally, has commingled their funds and other assets with SGC's, has taken over the day-to-day operations of Bally and has held out to the public and the trade that the parties are inseparable and are in fact one and the same company. To the extent that SGC has divested Bally of its own funds and assets, and thereby deprived Bally of the ability to pay in full any judgment this court may award in favor of Plaintiffs and against Bally, it would work a manifest injustice and fraud upon Plaintiffs not to hold SGC liable for any such deficiency or shortfall.

110.    By engaging in the above-described predatory acts, Defendants have willfully acquired, maintained, and enhanced their monopoly power in the relevant market. Today, Defendants control the market for automatic card shufflers, having nearly 100% of the market.

111.    The demand for card shufflers is generally limited to professional casinos, the number of which is strictly regulated. Virtually all of these casinos feature card games and virtually all of them possess card shufflers. As described above, there are no adequate substitutes for automatic card shufflers, and the market demand is inelastic. There are high barriers to entry, and Defendants' use of sham litigations has driven potential competitors from the market, leaving Plaintiffs and the class with limited options in procuring automatic card shufflers for their business.

112.    Thus, as a direct result of Defendants' anticompetitive conduct in excluding competitors and willfully acquiring and maintaining their monopoly power, Plaintiffs and the

proposed class were harmed by the increased the purchase price of their relevant automatic card shufflers. Additionally, Defendants' conduct harmed innovation and competition, which harmed Plaintiffs in the quality and price of their relevant automatic card shufflers.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray:

A.  That the Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be give to members of the Class;

B.  That the Court adjudge and decree that Defendants' unlawful conduct alleged herein constituted a violation of Sections 2 and 3 of the Sherman Act (15 U.S.C. §§ 2, 3)

C.  That the Court enter judgment against Defendants, jointly and severally, in favor of Plaintiffs and the Class;

D.  That the Court award Plaintiffs and the Class treble damages;

E.  That Defendant, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct alleged herein, or from committing any other conduct having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.  That the Court award Plaintiffs and the Class attorneys' fees and costs as well as pre-judgment and post-judgment interest as permitted by law;

G.  That the Court award Plaintiffs and the Class such other and further relief as may be deemed necessary and appropriate.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs request a jury trial on all matters so triable.

Dated:  October 30, 2020                              Respectfully submitted,

By:   */s/ Shannon M. McNulty*
Shannon M. McNulty
CLIFFORD LAW OFFICES, P.C.
120 N. LaSalle Street, Suite 3100
Chicago, Illinois 60602
(312) 899-9090
(312) 251-1160 (fax)
smm@cliffordlaw.com

Michael P. Lehmann (*pro hac vice* forthcoming)
Bonny Sweeney (*pro hac vice* forthcoming)
Christopher L. Lebsock (*pro hac vice* forthcoming)
HAUSFELD LLP
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 358-4980
Email: mlehmann@hausfeld.com
Email: bsweeny@hausfeld.com
Email: clebsock@hausfeld.com
Email: sstein@hausfeld.com

Scott Martin (*pro hac vice* forthcoming)
Jeanette Bayoumi (*pro hac vice* forthcoming)
HAUSFELD LLP
Broad Financial Center
33 Whitehall Street, 14th Floor
New York, NY  10004
Tel: (646) 357-1195
Fax: (212) 202-4322
Email: smartin@hausfeld.com
Email: jbayoumi@hausfeld.com

*Counsel for Plaintiffs Alfred T. Giuliano as Liquidation Trustee for RIH Acquisitions NJ, LLC dba The Atlantic Club Casino Hotel and Rancho's Club Casino, Inc. d/b/a Magnolia House Casino*

## **CERTIFICATE OF SERVICE**

     I, Shannon M. McNulty, an attorney, hereby certify that on October 30, 2020, I served the above and foregoing, by causing a true and accurate copy of such papers to be filed and served on all counsel of record via the Court's CM/ECF electronic filing system.


                              /s/ Shannon M. McNulty
                              Shannon M. McNulty
                              CLIFFORD LAW OFFICES
                              120 N. LaSalle Street, Suite 3100
                              Chicago, IL 60602
                              312.899.9090
                              SMM@cliffordlaw.com